BETTINA H. PRATT & others[1] *vs.* CITY OF BOSTON & others.[2]

Suffolk.   May 8, 1985. — September 30, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Practice, Civil,* Standing.  *Jurisdiction,* Taxable inhabitants' action, Declaratory relief.  *Boston Common.  Municipal Corporations,* Use of municipal property, Parks.  *Parks and Parkways.  Words,* "Building."

General Laws c. 231A, § 1, authorizing courts to grant declaratory relief, did not in and of itself provide the plaintiffs, taxpayers and residents of the city of Boston, with the standing required to maintain an action seeking a declaration that, by permitting a portion of the Boston Common to be used exclusively for the purpose of holding commercially sponsored concerts to which an admission is charged, the city, acting through a nonprofit corporation subject to the control of the mayor, violated terms of the Common's dedication as a public park and various laws regulating municipal powers and appropriations. [42-43] WILKINS, J., concurring.

A number in excess of ten taxpayers and residents of the city of Boston were not afforded standing under G. L. c. 40, § 53, to prevent the city, acting through a nonprofit corporation subject to the control of the mayor, from permitting a portion of the Boston Common to be closed off for an extended period of time and used to present commercially sponsored concerts to which an admission fee is charged, where the plaintiffs failed to establish, within the meaning of § 53, either that the city, through the nonprofit corporation, was "about to . . . expend money," or that it was "about to raise . . . money." [43-44] WILKINS, J., concurring.

A number in excess of ten taxpayers and residents of the city of Boston were not afforded standing under G. L. c. 214, § 3 (10), to prevent the city, acting through a nonprofit corporation subject to the control of the mayor, from permitting a portion of the Boston Common to be closed off for an extended period of time and used to present commercially sponsored concerts to which an admission fee is charged, where the Common had not been "conveyed to and accepted by" the city "for a specific purpose

---

[1] Sixteen taxpayers of the city of Boston and the Beacon Hill Civic Association, Inc., a Massachusetts charitable corporation.

[2] The Boston parks and recreation department, the board of park commissioners of the Boston parks and recreation department, and the Fund for Boston Neighborhoods, Inc.

or purposes in trust or otherwise," but had vested at the time of con-
veyance in fee simple in the city free from any trust. [45-46] WILKINS,
J., concurring.

General Laws c. 45, § 7, authorizing suits by ten or more taxpayers to re-
strain the erection of any "building which exceeds six hundred square
feet in area on the ground . . . on a common or park dedicated to the
use of the public without leave of the general court," afforded standing
to the plaintiffs, in their suit seeking to prevent the city of Boston from
permitting the exclusive use of a portion of the Boston Common for the
purpose of holding a concert series, to raise the limited question whether
the enclosure and stage erected for the purposes of the concerts constituted
a "building" under § 7. [46-47] WILKINS, J., concurring.

A temporary concert stage with an awning-type roof and no walls, erected
on the Boston Common to accommodate the performance of a four-month
long concert series, was not a "building" under G. L. c. 45, § 7, which
would require leave of the General Court before it could be constructed.
[47-48] WILKINS, J., concurring.


CIVIL ACTION commenced in the Superior Court Department
on May 21, 1984.

The case was reported to the Appeals Court by *James P.
Lynch, Jr.,* J. The Supreme Judicial Court granted a request
for direct review.

*John D. Hanify (David Lee Evans* with him) for the plaintiffs.

*Thomas H. Martin* for the Fund for Boston Neighborhoods,
Inc.

*Dennis A. Quilty,* Assistant Corporation Counsel, for the
city of Boston, was present but did not argue.

ABRAMS, J. More than ten taxpayers and residents of the
city of Boston seek a declaration that permitting the exclusive
use of a portion of Boston Common for the purpose of holding
Concerts on the Common is an infringement on the plaintiffs'
"easement rights" in the Common, that the city is without
authority to surrender the Common site for private and commer-
cial uses, and that the Concerts on the Common constitute an
impermissible scheme for the generation of municipal revenue.
The plaintiffs also seek to enjoin the defendants, the city of
Boston (the city), the board of park commissioners of the
Boston parks and recreation department (the park commission-
ers), and the Fund for Boston Neighborhoods, Inc. (the Fund),

from (1) entering into contracts or commitments with third parties regarding the site of a concert series on the Boston Common (Concerts on the Common); (2) initiating construction of fences around, or otherwise building on, the site of the Concerts on the Common; and (3) proceeding in any way with the 1985 Concerts on the Common program.

The plaintiffs propose three bases for their request for declaratory and injunctive relief. They argue that: (1) the park commissioners' grant of leave to the Fund to use a 2.5 acre site on the Common for the purpose of holding Concerts on the Common is a violation of the terms of the Common's dedication as a public park; (2) the park commissioners have exceeded the scope of their statutory powers and have violated applicable statutes by authorizing the erection of structures or buildings on the Common for the use of the Concerts on the Common; and (3) the structure of the relationship between the city and the Fund, under which the Concerts on the Common are sponsored and the Fund secures the beneficial use of parkland is a violation of laws regulating municipal powers and appropriations. We conclude that the plaintiffs lack the requisite standing to litigate their claims except whether the stage used by Concerts on the Common is a building too large to be erected on Boston Common without leave of the General Court. G. L. c. 45, § 7. We hold that the stage at issue is not a building within the meaning of G. L. c. 45, § 7.

We summarize the facts as agreed to by the parties. The Fund was incorporated in 1968 by the mayor of Boston and others as a nonprofit corporation under G. L. c. 180 (1984 ed.).[3] The Fund's by-laws provide that the mayor may appoint and remove Fund members and, since 1970, that the president of the Fund shall be the person serving as director of the Office of Cultural Affairs. Some Fund members have been full-time employees of the city while others have not. The Fund was intended to be used and has been used for purposes of the executive branch of the city government. The business office

[3] The Fund was originally incorporated under the name of "The Boston Foundation, Inc."

of the Fund is located in the same room in City Hall as that of the Office for Business and Cultural Development. The city has provided and continues to provide the Fund with free office space, utilities, and the occasional services of corporation counsel as well as clerical assistance. The Fund enters into no-bid contracts with the city, pursuant to St. 1909, c. 486, § 30, for the provision of, inter alia, technical services to cultural groups serving Boston residents and visitors, publicity for cultural events, research services, cultural grant programs, and the production of exhibits, receptions, and performances in various city locations. The Fund also solicits and receives private donations to support various endeavors.

During the period June through September of the years 1982, 1983, 1984, and 1985, the Fund has sponsored the Concerts on the Common series. In each year, the Fund has been granted, pursuant to an agreement with the Commission, the use of a 2.5-acre site on the eastern side of the Common, bordering Tremont Street and adjacent to the Parkman Bandstand. In accordance with the agreement, the Fund, at the conclusion of the series each year, has caused the facilities constructed to be dismantled and has borne the expense of resodding the site.

In each of the years 1982 through 1984,[4] a ten-foot-high barricade fence was constructed around the 2.5-acre Common site. The fence restricts access to the site by plaintiffs and other members of the public not attending the concerts, on a continuous basis for the period of the concert season. On conclusion of the concert series, access to the site is restricted for an additional period to permit resodding and replanting of the site. Within the fenced area, on the site, are located seating for 10,000 people, as well as a concert stage and other structures, including portable public toilets, concession stands, and a courtesy booth. At least three dressingroom trailers

---

[4] Although the facts were agreed to by the parties before the 1985 series, we take judicial notice of the fact the 1985 concerts were held. Because the parties agreed to the facts in 1984, no details regarding the 1985 series are given.

and other vehicles are parked on the site to accommodate the performers, stage hands, musical equipment, amplifiers, and sound systems.

The concert stage is more than 2,500 square feet in size with a roof of approximately equal area. The stage stands five feet high and contains an extensive lighting apparatus, a loading dock sixteen feet square, and an adjoining 190-square-foot roofed "mix" platform which holds musical equipment and amplifiers. Two roofed concession stands, occupying 600 square feet each, and a third roofed concession stand, occupying 300 square feet, are located inside the fence and along the perimeter of the seating.

In 1983 and 1984, the gross revenue from the concerts was approximately $2,325,000 and $2,195,000, respectively. After expenses, in 1983, the WBZ Fund for the Arts received approximately $193,000 pursuant to its sponsorship agreement with the Fund, and approximately $288,000 was disbursed through the Neighborhood Arts Program to cultural and arts organizations in the city. In 1984, pursuant to the sponsorship agreement, the WBZ Fund for the Arts received approximately $233,000 and the city received $135,000 to support the summer operation of the Boston Community School Pools for the public.

The plaintiffs filed a complaint in the Superior Court in May, 1984. A judge of that court denied the plaintiffs' application for a preliminary injunction.[5] At the request of the parties and pursuant to G. L. c. 231, § 111 (1984 ed.), and Mass. R. Civ. P. 64, 365 Mass. 831 (1974), the judge reported the case without decision to the Appeals Court. We allowed the parties' joint application for direct appellate review.[6] Before inquiring

---

[5] The judge concluded as follows: "The mere recital of the relief sought demonstrates that this action involves serious and substantial issues of importance, which issues, apt to involve not only present but future conduct, should be fully considered and dispassionately determined, upon an adequate record and sufficient opportunity for enlightened judicial reflection."

[6] On June 10, 1985, we issued an order denying without prejudice the plaintiffs' request for a temporary restraining order and injunction pending appeal.

into the merits of the plaintiffs' challenges, we first address the plaintiffs' assertions of standing to raise these issues.

1. *Standing*.

Questions of standing typically arise when litigants bring a complaint alleging that executive or legislative action exceeds statutory or constitutional limitations. "From an early day it has been an established principle in this Commonwealth that only persons who have themselves suffered, or who are in danger of suffering, legal harm can compel the courts to assume the difficult and delicate duty of passing upon the validity of the acts of [another] branch of the government." *Kaplan* v. *Bowker,* 333 Mass. 455, 459 (1956). *Doe* v. *The Governor,* 381 Mass. 702, 704 (1980). Moreover, "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge College* v. *Americans United for Separation of Church & State,* 454 U.S. 464, 486 (1982).

Further, there is no general equity jurisdiction "to entertain a suit by individual taxpayers to restrain cities and towns from carrying out invalid contracts, and performing other similar wrongful acts." *Fuller* v. *Trustees of Deerfield Academy,* 252 Mass. 258, 259 (1925), quoting *Steele* v. *Municipal Signal Co.,* 160 Mass. 36, 38-39 (1893). Accordingly, the plaintiffs in this action must show a statutory foundation for standing. The plaintiffs suggest four separate statutory bases for standing: (1) the declaratory judgment statute — G. L. c. 231A; (2) the "ten-taxpayer" statute — G. L. c. 40, § 53 (1984 ed.); (3) G. L. c. 214, § 3 (10) (1984 ed.); and (4) G. L. c. 45, § 7 (1984 ed.). We examine each statute in turn.

(a) *The declaratory judgment statute — G. L. c. 231A.*[7] The plaintiffs are incorrect in their assertion that G. L. c. 231A

___

[7] General Laws c. 231A, § 1 (1984 ed.), provides in relevant part: "The supreme judicial court, the superior court, the land court and the probate courts, within their respective jurisdictions, may on appropriate proceedings make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen and is specifically set forth in the pleadings and whether any consequential judgment or relief is or could be claimed at law or in equity or not; and such proceeding shall not be open to objection on the ground that a merely declara-

provides an independent statutory basis for standing or subject matter jurisdiction. General Laws "c. 231A, § 1 . . . does not expand the jurisdiction of the courts upon which it confers power to render declaratory decrees." *Konstantopoulos* v. *Whately,* 384 Mass. 123, 127 (1981). See *Sisters of the Holy Cross* v. *Brookline,* 347 Mass. 486, 491 (1964). *Cabot* v. *Assessors of Boston,* 335 Mass. 53, 57 (1956). "Even if there is an actual controversy, the particular plaintiff must demonstrate the requisite legal standing to secure its resolution." *Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.,* 373 Mass. 290, 292 (1977). "[T]he requirement of 'standing' is not avoided by a prayer for declaratory relief." *Doe* v. *The Governor, supra* at 704. General Laws c. 231A, therefore, does not in and of itself provide the plaintiffs with the "standing" required to maintain this action.

(b) *The "ten-taxpayer" statute — G. L. c. 40, § 53.*[8] The plaintiffs "submit[ ] that there is a direct relationship between the City's financial support of the Fund and the challenged Concert activity" and that this relationship affords the plaintiffs standing under G. L. c. 40, § 53. The plaintiffs assert that "[t]he pending 1985 no-bid contract, the continued operational subsidization of the Fund by the City, and the conceded likelihood of the Fund's continued sponsorship of the Concerts clearly create a situation where the city" is about to . . . expend

tory judgment or decree is sought thereby and such declaration, when made, shall have the force and effect of a final judgment or decree and be reviewable as such . . . ."

[8] General Laws c. 40, § 53 (1984 ed.), provides as follows: "If a town, regional school district, or a district as defined in section one A, or any of its officers or agents are about to raise or expend money or incur obligations purporting to bind said town, regional school district, or district for any purpose or object or in any manner other than that for and in which such town, regional school district, or district has the legal and constitutional right and power to raise or expend money or incur obligations, the supreme judicial court or superior court may, upon petition of not less than ten taxable inhabitants of the town, or not less than ten taxable inhabitants of any town in the regional school district, or not less than ten taxable inhabitants of that portion of a town which is in the district, determine the same in equity, and may, before the final determination of the cause, restrain the unlawful exercise or abuse of such corporate power."

money," within the meaning of the statute. In the alternative, the plaintiffs urge that the city, through the Fund, is "about to raise . . . money" within the meaning of G. L. c. 40, § 53. We conclude that the plaintiffs are not afforded standing under either prong of the statute.

We review the facts specific to this question. The parties agree that "[t]he Fund enters into contracts with the City of Boston for the provision to or for the City of certain services," and that "[s]uch contracts have been awarded on a no-bid basis . . . ." The exhibits to the parties' statement of agreed facts include a letter, dated January 7, 1985, from the director of the office of business and cultural development to the mayor of the city requesting "permission to dispense with public advertising and to award a contract to The Fund for Boston Neighborhoods Inc. . . ." The letter states that "[u]nder the proposed agreement, The Fund for Boston Neighborhoods Inc. will pay for all labor and materials furnished. The period of performance will be January 14, 1985 to June 30, 1985. The cost to the City of this contract will not exceed $90,000." The parties have further stipulated that the Fund "is located in Room 802, Boston City Hall [and that] [t]he City has provided and continues to provide the Fund with rent-free office space, free telephone, lights, heat, and occasional legal services of the Corporation Counsel and occasional clerical assistance." These facts alone do not establish that the city is about to expend money. See *Lynch* v. *Cambridge,* 330 Mass. 308, 311 (1953). Contrast *Sears* v. *Treasurer & Receiver Gen.,* 327 Mass. 310 (1951) (challenged statute necessarily called for expenditure of large sums of money). The plaintiffs, in short, have not made a showing of their standing under the expenditure prong of G. L. c. 40, § 53.

Nor is standing available to the plaintiffs on the ground that the city is about to raise money under G. L. c. 40, § 53. "The words 'to raise money' as applied to a municipality commonly mean to raise by taxation." *Dowling* v. *Assessors of Boston,* 268 Mass. 480, 484 (1929). The challenged conduct in the instant action cannot be considered as a form of taxation.

(c) *G. L. c. 214, § 3 (10).*[9] This statute confers jurisdiction on the Supreme Judicial and Superior Courts over actions to enforce "the purpose or purposes of any . . . conveyance which has been . . . made to and accepted by any . . . city . . . for a specific purpose or purposes in trust or otherwise . . . ." The statute also provides that such action "shall be commenced only by the attorney general or, with leave of court, by ten taxpayers of such . . . city . . . . In the case of an action by ten taxpayers . . . , the attorney general shall be served with notice of the preliminary petition for leave, and may intervene as a party. . . ." The plaintiffs notified the Attorney General, but he declined to intervene. The Superior Court judge allowed the plaintiffs' claim to proceed on the basis of G. L. c. 214, § 3 (10). The statute does not assist the plaintiffs.

The focus of G. L. c. 214, § 3 (10), is on the status of the property at issue at the time that it was originally conveyed to the city. In 1634, the town of Boston bought the land now constituting Boston Common from William Blackstone. The "town bought and paid for the Blackstone land and received in fee from him free from restrictions." *Lowell* v. *Boston,* 322 Mass. 709, 725 (1948). "[T]he Common vested in fee simple in the town free from any trust . . . ." *Lowell* v. *Boston, supra* at 729. Because the Common was not "conveyed to and accepted by" the city "for a specific purpose or purposes in trust

---

[9] General Laws c. 214, § 3 (1984 ed.), reads in relevant part as follows: "The supreme judicial and superior courts shall have original and concurrent jurisdiction of the following cases: . . . (10) Actions to enforce the purpose or purposes of any gift or conveyance which has been or shall have been made to and accepted by any county, city, town or other subdivision of the commonwealth for a specific purpose or purposes in trust or otherwise, or the terms of such trust, or, if it shall have become impracticable to observe or carry out such purpose or purposes, or such terms, or, if the occasion therefor shall have terminated, to determine the purposes or uses to which the property involved shall be devoted and enforce the same. Such action shall be commenced only by the attorney general or, with leave of court, by ten taxpayers of such county, city, town or other subdivision. . . . In the case of an action by ten taxpayers as aforesaid, the attorney general shall be served with notice of the preliminary petition for leave, and may intervene as a party at any stage of the proceedings. . . ."

or otherwise," G. L. c. 214, § 3 (10),[10] does not aid the plaintiffs in asserting standing.[11]

(d) *G. L. c. 45, § 7.*[12] This statute authorizes suits by ten or more taxpayers to restrain the erection of any "building which exceeds six hundred square feet in area on the ground . . . on a common or park dedicated to the use of the public without leave of the general court." The parties have agreed to the fact that the area of the concert stage exceeds six hundred square feet. The defendants thus concede that G. L. c. 45, § 7, properly gives the plaintiffs standing, but only as to the limited question whether the enclosure and stage erected for the purposes of the concerts constitute a "building" under the statute.

In view of the highly restricted scope of the plaintiffs' standing, we are limited, in the end, to the determination of one substantive issue: whether the concert stage used during the Concerts on the Common is a building within G. L. c. 45, § 7.

---

[10] The plaintiffs assert that "in these unique circumstances" the dedication of Boston Common by "operation of common law" is a substitute for the statutory requirement that the land be conveyed to and accepted by the City for a specific purpose or purposes in trust or otherwise. G. L. c. 214, § 3 (10). The conclusory nature of the plaintiffs' argument does not comply with the rule that the argument in an appellant's brief "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Mass. R. A. P. 16 (a)(4), as amended, 367 Mass. 919 (1975). In any event, a statute containing plain terms must be applied as written.

[11] The Attorney General is an appropriate public official with standing to bring an action to protect the public interest in parkland.

[12] General Laws c. 45, § 7 (1984 ed.), reads as follows: "Land taken for or held as a park under this chapter shall be forever kept open and maintained as a public park, and no building which exceeds six hundred square feet in area on the ground shall be erected on a common or park dedicated to the use of the public without leave of the general court; but, except in parks in Boston and in parks comprising less than one hundred acres in extent, structures for shelter, refreshment and other purposes may be erected of such material and in such places as, in the opinion of the fire commissioners, if any, do not endanger buildings beyond the limits of such park. The superior court shall have jurisdiction in equity, upon petition of not less than ten taxable inhabitants of the city or town in which such common or park is located, to restrain the erection of a building on a common or park in violation of this section."

We conclude that the stage is not a building and that its construction does not violate the statutory prohibition.

2. *Merits.*

The plaintiffs argue that G. L. c. 45, § 7, see note 12, *supra,* precludes the construction of the stage used by Concerts on the Common. General Laws c. 45 restrains the erection of *buildings* of a specified size. We must thus first ask whether the concert stage[13] is a "building" within G. L. c. 45, § 7. We conclude that it is not.

The stage is more than 2,500 square feet with an awning-type roof of approximately equal area and contains a loading dock and an adjoining roofed "mix" platform which holds musical equipment and amplifiers. It has no walls. The stage remains in place on the site for only four months of the year.

A temporary stage without walls does not conform to the ordinary meaning of "building" — "a structure or edifice enclosing a space within its walls and usually covered with a roof, such as a house, a church, a shop, a barn or a shed." *Nowell* v. *Boston Academy of Notre Dame,* 130 Mass. 209, 210 (1881). Although in *Truesdell* v. *Gay,* 13 Gray 311, 312 (1859), we said that a building is "an erection intended for use and occupation as a habitation or for some purpose of trade, manufacture, ornament or use," constituting a fabric or edifice, we further limited the definition to such structures as "a house, a store, a church, a shed." *Id.*[14]

The statute itself provides no definition of the word "building." The plaintiffs point to a definition of the word in G. L. c. 143, § 1, a chapter addressing the safety inspection and regulation of, inter alia, buildings. There, a building is defined

---

[13] The plaintiffs do not argue that G. L. c. 45, § 7, affords them standing to raise any question other than whether the concert stage is a building. Because the plaintiffs do not contend that any structure other than the stage is a building within G. L. c. 45, § 7, we address the issue of the definition of a "building" only as it relates to the stage.

[14] The instant case is distinguishable from *Reardon* v. *Murphy,* 163 Mass. 501 (1895) (a covered piazza attached to a house is a building), and *Attorney Gen.* v. *Gardiner,* 117 Mass. 492, 500 (1875) (brick structure for the accommodation of coal bins is a building), because the stage is temporary, has no walls, is not used for shelter, or general storage purposes.

as "a combination of any materials, whether portable or fixed, having a roof, to form a structure for the shelter of persons, animals or property." This definition does not by its terms apply to statutes other than G. L. c. 143. Even if this definition were controlling, however, the temporary stage would not fall within its ambit because the stage does not provide shelter of persons, animals, or property. Its purpose is merely to accommodate most conveniently the performers and their equipment shortly before, during and after a performance. We conclude that the stage is not a building. We adhere to our prior statement that "[t]he word 'building' cannot be held to include every species of erection on land." *Truesdell* v. *Gay,* 13 Gray 311, 312 (1859).

3. *Summary.*

The plaintiffs have standing only as to the question whether the concert stage used during Concerts on the Common is a "building" under G. L. c. 45, § 7. We conclude that the stage is not a building requiring leave of the General Court before it may be erected. The case is remanded to the Superior Court for entry of a judgment consistent with this opinion.

*So ordered.*

WILKINS, J. (concurring). The city of Boston, acting through a nonprofit corporation subject to the control of the mayor, has permitted a portion of Boston Common to be closed off annually for an extended period and used to present commercially sponsored concerts to which an admission fee is charged. This limitation on the open use of the Common may be unlawful. The city's use of a nonprofit corporation to arrange for the concerts, involving gross annual revenues of more than $2,000,000 (none of which is placed in the city's treasury), raises questions under the municipal finance law.

In its opinion, the court properly concludes that, under the current state of the law of the Commonwealth and the procedural theories on which the plaintiffs rely, the plaintiffs lack standing to raise these issues for judicial decision. The plain-

tiffs do not argue, however, that they seek to enforce a mandatory duty that the defendants, or one or more of them, may have to limit use of the Common to the public purpose to which it has been dedicated. It is not clear that standing to obtain relief in the nature of mandamus would be denied to persons in the plaintiffs' position. See *Douglas* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 366 Mass. 459, 461 (1974); *Robbins* v. *Department of Pub. Works,* 355 Mass. 328, 330 (1969); *Gould* v. *Greylock Reservation Comm'n,* 350 Mass. 410 (1966). See also *Pilgrim Real Estate, Inc.* v. *Superintendent of Police of Boston,* 330 Mass. 250, 251 (1953). In addition, the plaintiffs might have contended, but do not, that the nonprofit corporation is for certain purposes an agent of the city subject to G. L. c. 44, § 53 (1984 ed.), and that they may maintain an action challenging certain aspects of that corporation's operations pursuant to G. L. c. 44, § 59. Moreover, quite apart from the involvement of the corporation, on a different record in another year, these plaintiffs or other taxpayers may be able to demonstrate that the city is "about to . . . expend money" for an illegal purpose. G. L. c. 40, § 53.[1]

The wrongs allegedly committed by the city seem not so much to be the unlawful expenditure of appropriated funds as the city's exceeding its municipal authority in the manner in which it has permitted the Common to be used and in the use of a nonprofit corporation. The plaintiffs lack standing to present these questions for decision under the procedural theories on which they rely. The court's decision must not, of course, be construed as an endorsement of the lawfulness of the city's practices.

---

[1] The current problem in this respect is that there is no showing on the record of a threatened unlawful expenditure of city funds in any quantifiable amount. The only record facts which approach such a showing concern the city hall office facilities provided to the nonprofit corporation at no charge. Even if it could be shown that the city acted unlawfully in providing free office space to the nonprofit corporation, a decision to that effect would hardly reach the underlying questions concerning the use of the Common and the use of the nonprofit corporation.